IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STEPHANIE N. EVANS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 15-134-SLR |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner, Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

Angela Pinto Ross, Esquire of Doroshow, Pasquale, Krawitz & Bhaya, Wilmington, Delaware.  Counsel for Plaintiff.

Charles M. Oberly III, Esquire, United States Attorney, District of Delaware, and Patricia Stewart, Esquire, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia Pennsylvania.  Of Counsel: Nora Koch, Esquire, Acting Regional Chief Counsel, Social Security Administration, Office of General Counsel, Philadelphia, Pennsylvania.  Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: June 20, 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Stephanie Nicole Evans ("plaintiff") appeals from a decision of Carolyn W. Colvin, the Acting Commissioner of Social Security ("defendant"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. (D.I. 1) Plaintiff has filed a motion for summary judgment asking the court to remand for further proceedings. (D.I. 8, 9, 14) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm her decision and enter judgment in her favor. (D.I. 12, 13) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[1]

## II. BACKGROUND

### A. Procedural History

Plaintiff filed a protective claim for DIB on April 29, 2010, asserting disability as of April 29, 2010 due to herniated discs in the neck and back, lupus, depression, Sjogren's syndrome, spondylosis of the spine, chronic pain, vitamin D deficiency, asthma, and acid reflux. (D.I. 6-3 at 2) Her claim was denied initially and after reconsideration. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on January 14, 2013. (D.I. 6-2 at 42) Plaintiff,

---

[1]Under § 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

represented by counsel, appeared and testified. (*Id.*) A vocational expert ("VE") also testified. (D.I. 6-2 at 22)

In a decision dated April 25, 2013, the ALJ found that plaintiff had severe impairments of systemic lupus erythematosus ("SLE"),[2] fibromyalgia, upper airway resistance syndrome, cervical spondylosis, cognitive disorder, and diarrhea." (*Id.* at 24) The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[3] to perform work and was not disabled. The Appeals Council considered plaintiff's objections to the ALJ's decision and denied her request for review on December 8, 2014. (D.I. 6-2 at 2) Having exhausted her administrative remedies, plaintiff filed a civil action on February 6, 2015, seeking review of the final decision. (D.I. 1)

## B. Factual Background

The record medical evidence reflects that, in 1998, plaintiff commenced treatment with Dr. Stanley Savinese, Jr., as her primary care physician. Patricia Eckart, a certified registered nurse practioner ("CRNP"), works in Dr. Savinese's office and began providing primary care to plaintiff in October 2009. Sometime in 2008, plaintiff was diagnosed with lupus. (D.I. 6-7 at 6)

---

[2]Lupus is a chronic inflammatory autoimmune disease that can affect any organ or body system which is "frequently, but not always, accompanied by constitutional symptoms or signs," including severe fatigue, fever, malaise, and involuntary weight loss. Major organ and body system involvement can include respiratory, cardiovascular, renal, hematologic, skin, neurologic, mental, or immune system disorders. 14.00D1a, 20 C.F.R. Part 404, Subpart P, Appendix 1. For purposes of the court's review, lupus and SLE will be used interchangeably.

[3]RFC is the ability to work despite physical and/or mental limitations. 20 C.F.R. § 404.1545(c).

2

On June 5, 2008, on the recommendation of Dr. Savinese, plaintiff went to Dr. Robert Cabry, an orthopedist. (D.I. 6-8 at 12) Progress notes reflect that her chief complaints were bilateral wrist and neck pain, and stiffness. She also reported problems with right-sided facial numbness with pain radiating into the right shoulder to the thumb, and problems with gripping and rotating. A physical examination revealed "full range of motion without pain, tenderness, crepitus, or instability except at the cervical spine where she has full range of motion" but has problems with side bending to the right. (D.I. 6-8 at 12) Dr. Cabry noted that plaintiff had full range of motion of the wrist with some tenderness, but no swelling and adequate strength, sensation and reflexes. Dr. Cabry prescribed Relafen.[4]

Dr. Frank Passero, a rheumatologist, evaluated plaintiff on July 11, 2008. Dr. Passero explained that the results of her recent blood work testing demonstrated that she had lupus. (D.I., 6-7 at 37-38)

On July 22, 2008, plaintiff returned to Dr. Cabry, complaining of multiple joint pain, fatigue, loss of hair and continued difficulties in concentrating. (D.I. 6-8 at 11) Plaintiff laboratory testing showed "clinical findings leaning toward Sjogren's disease.[5]

---

[4]Relafen is a nonsteroidal anti-inflammatory drug. *See* http://www.drugs. com/relafen.html (Last visited on June 6, 2016).

[5]Sjogren's syndrome is an immune-mediated disorder of the exocrine glands. Involvement of the "lacrimal and salivary glands is the hallmark feature, resulting in symptoms of dry eyes and dry mouth, and possible complications, such as corneal damage, blepharitis (eyelid inflammation), dysphagia (difficulty in swallowing), dental caries, and the inability to speak for extended periods of time. Involvement of the exocrine glands of the upper airways may result in persistent dry cough." 14.00D7a, 20 C.F.R. Part 404, Subpart P, Appendix 1.

3

Dr. Cabry advised plaintiff to schedule appointments with a rheumatologist and a

neurologist.

On October 8, 2008, plaintiff had a follow-up appointment with Dr. Cabry,

complaining of multiple joint pain, fatigue, cognitive deficits, neck stiffness, ankle pain,

wrist pain, and headaches. (D.I. 6-8 at 10) The physical examination revealed:

> Vital signs are stable, documented in the chart. She is alert and
> oriented and very cooperative. Mood and affect is appropriate.
> Evaluation of the spine as well as upper and lower extremities
> reveals skin intact without lesion or rashes. Pulses are + 2 and
> symmetric. There is no lymphadenopathy. She has a full range
> of motion and full strength, although she describes pain on range
> of motion and resistive strength testing. No other gross findings noted.

(Id.) Dr. Cabry concluded that plaintiff was depressed and that her cognitive deficits

were progressing. He recommended that plaintiff see a neurologist. Dr. Cabry also

prescribed Lexapro[6] "to help with energy and the dysthymic issues."

On October 20, 2008, plaintiff was treated by Dr. Arthur Hubbert, for complaints

of severe pain. (D.I. 6-7 at 2) Dr. Hubbert prescribed Neurontin,[7] Tramadol,[8]

---

[6]Lexapro is "used to treat anxiety in adults." See http://www.drugs.com/lexapro.html (Last visited on June 6, 2016).

[7]Neurontin is used to treat nerve pain. See http://www.drugs.com/neurontin.html (Last visited on June 6, 2016).

[8]Tramadol is a "narcotic-like pain reliever." See http://www.drugs.com /tramadol.html (Last visited on June 6, 2016).

Plaquenil,[9] a firm neck collar, wrist and ankle supports,. He suggested she see a

neurologist.

On October 28, 2008, neurologist Dr. Joan Sweeney evaluated plaintiff.

According to Dr. Sweeney's notes, plaintiff presented with several complaints, including

"neck pain in the cervical distribution." (D.I. 6-12 at 19) Further,

> [p]laintiff has known cervical spondylosis. The last MRI of the cervical spine
> ordered by Dr. Cabry was on June 6, 2008. This reveals multilevel cervical
> spondylosis and a C5-6 central right articular osteophyte complex
> flattening the right aspect of the cervical spinal cord. At present, plaintiff
> does not appear overtly myelopathic . . . . In light of her cognitive issues and
> history of lupus, I would also like her to have an updated MRI of the head and
> MRA of the head due to her cognitive difficulties. Plaintiff should have a
> neurocognitive evaluation with Dr. Borson as well and an EEG to rule out
> remote partial complex seizure activity.

(Id.)

In November 5, 2008, plaintiff had an MRA and EEG performed . (D.I. 6-12 at 6;

D.I. 6-12 at 15) Dr. Sweeney concluded the EEG was normal.

In a letter dated November 14, 2008, Dr. Catherine J. DiGregorio indicates that

plaintiff was seen for severe pain, chronic history of neck pain, headaches, and sleep

problems. (D.I. 6-7 at 9) An MRI of the cervical spine showed "multilevel cervical

spondylosis, C5-C6 central right disc osteophyte complex flattening the right aspect of

the cervical spinal cord." (Id.) Dr. DiGregorio recommended a right C7-T1 epidural

steroid injection, to which plaintiff agreed. The procedure was performed on November

9, 2008, without complication. (Id. at 13)

---

[9]Plaquenil is also used to treat symptoms of rheumatoid arthritis and discoid or
systemic lupus erythematosus. See http://www.drugs.com/plaquenil.html (Last visited
June 5, 2016).

On January 14, 2009, plaintiff appeared for an appointment with Dr. Cabry, complaining of problems with lupus and cervical spondylosis. (D.I. 6-8 at 9) A physical examination revealed that plaintiff had full range of motion without pain, tenderness, crepitus, or instability, and had full strength, sensation and reflexes as well. Dr. Cabry recommended that plaintiff continue her medical regime and start physical therapy. (Id.)

On January 20, 2009, plaintiff commenced physical therapy. (D.I. 6-7 at 28) Her primary complaints were weakness in right hand, difficultly sleeping, fatigue, poor endurance and asthma. Her prognosis for rehabilitation was good. (Id. at 29)

On February 25, 2009, plaintiff returned to Dr. Cabry, complaining of lupus and cervical spondylosis. (D.I. 6-8 at 8) A physical examination was not performed. Dr. Cabry concluded that she was flaring with degenerative spondylosis of the cervical spine. He increased dosage of Lyrica,[10] and continued Lexapro, Amrix,[11] and Relafen.

On April 21, 2009, plaintiff had a appointment with Dr. Passero. (D.I. 6-7 at 16) He ordered lab work and testing. (D.I. 6-7 at 25-26)

Plaintiff returned to Dr. Sweeney on April 30, 2009. (D.I. 6-12 at 30) Examination notes state no changes in plaintiff's condition since last visit in 2008.

On July 9, 2009, plaintiff had a follow-up appointment with Dr. Cabry, complaining about lupus and mild depression. (D.I. 6-8 at 7) Plaintiff reported feeling

---

[10]Lyrica "is used to control seizures and to treat fibromyalgia." See http://www.drugs. com/lyrica.html (Last visited on June 6, 2016).

[11]Amrix is a muscle relaxant. See http://www.drugs.com/mtm/amrix.html (Last visited on May 9, 2016).

6

improvement with lupus symptoms, but remained sluggish and depressed.

Neurovascular and mental status examinations were normal. Dr. Cabry ordered an

increase in Lexapro to help with depression and continued all medications.

On August 11, 2009, plaintiff returned to Dr. Cabry for joint aches. (D.I. 6-8 at 6)

The examination notes reveal

> tenderness [of hands] through the thumbs, base of the thumb at the
> CMC joint and thenar region. She has full grip strength, but causes
> some discomfort. There is crepitus on range of motion of the
> wrist. There is tenderness of the thighs, but no pain on range of motion of
> the hips, knees or ankles. She is otherwise neurovascularly intact.

(Id.) Dr. Cabry surmised that plaintiff's lupus was flaring and prescribed prednisone[12]

for five days to "shut this off" and ordered blood work.

On September 22, 2009, plaintiff was examined by rheumatologist Dr. Passero.

Progress notes reflect that plaintiff has lupus or Sjogren's syndrome with positive ANA ,

degenerative joint disease, vitamin D deficiency and possible fibromyalgia. (D.I. 6-7 at

15)

On October 6, 2009, plaintiff was treated by Dr. Savinese for symptoms of fever,

fatigue, ulcers in the mouth, loose bowel movements and a dry, chocking cough during

her sleep. (D.I. 6-9 at 76) His diagnosis was lupus, diarrhea and ulcers. (Id. at 76-78)

On April 15, 2010, plaintiff had a follow-up appointment with Dr. Cabry,

complaining of hand pain, particularly around the base of her thumb and index finger.

(D.I. 6-8 at 5) She has a recurrence of right wrist ganglion. Plaintiff has used a paraffin

---

[12]Prednisone is a "corticosteroid. It prevents the release of substances in the
body that cause inflammation. It also suppresses the immune system." See
http://www.drugs.com/prednisone.html (Last visited May 9, 2016).

bath with minimal relief. She reported feeling very uncomfortable which caused more fatigue. After conducting a physical examination, Dr. Cabry assessed plaintiff's symptoms as related to lupus and a flare of arthritis is her hands. He prescribed steroids to combat the flare of lupus in her hands, noting that her condition was under poor control and that her hand pain was making her tired. (D.I. 6-8 at 5)

During an April 20, 2010 office visit with Dr. Savinese, plaintiff complained of being in a lot of pain because lupus was attacking her hands making it difficult for her to open jars. (D.I. 6-9 at 12) Dr. Savinese's physical exam revealed: mild pain and distress; head, eyes, nose, ears, mouth within normal limits; some palpable spasm found in neck; lungs clear; and heart rate and rhythm regular. (Id. at 12- 14) A lab report reflects the presence of positive ANA antibodies.[13] (Id. at 6-9 at 8)

On or about April 26, 2010, plaintiff called into Dr. Savinese's office complaining of fever, cramping, and diarrhea from lupus. (D.I. 6-9 at 66) Dr. Savinese prescribed Bentyl.[14] Plaintiff indicated that she did not go to work because of symptoms related to lupus.

On April 28, 2010, CRNP Eckart noted plaintiff's complaints of fatigue, weakness, malaise, joint pain, swelling and stiffness, muscle weakness, loss of strength and muscle aches. (Id. at 63) Eckart assessed her condition as systemic lupus

---

[13]An "antinuclear antibody ("ANA") test detects ANA in blood. See http://www.mayoclinic. org/tests-procedures/ana-test/basics/definition/prc-20014566 (Last visited on June 6, 2016).

[14]Bentyl is "used for treating symptoms of irritable bowel syndrome." See http://www.drugs.com/cdi/bentyl.html (Last visited on June 3, 2016).

8

erythematosus. (*Id.* at 64) She recommend that plaintiff follow-up with rheumatologist Dr. Rizu Khurana. (*Id.* at 11)

Dr. Savinese completed work certificates excusing plaintiff from work: (1) beginning on May 5, 2010 and ending on May 25, 2010 (D.I. 6-9 at 44); (2) beginning on May 24, 2010 and ending on July 27, 2010 (D.I. 6-9 at 36); (2) beginning July 26, 2010 and ending on October 1, 2010 (D.I. 6-9 at 17).

In notes dated May 5, 2010, CRNP Eckart notes plaintiff has fatigue, weakness, muscle cramps, joint pain and swelling, stiffness, muscle weakness and muscle aches, and her assessment was lupus. Lab results from May 5 and 14, 2010 show positive ANA, positive Sjogren's antibodies, and positive rheumatoid factor. (*Id.* at 60) CRNP Eckart sent letters to plaintiff indicating that tests were positive for lupus and Sjogren's syndrome.

In May 2010, Dr. Khurana evaluated plaintiff on two occasions. (D.I. 6-7 at 53, 60) Plaintiff's symptoms were: fatigue, hurting all over, joint pain, ulcers, sleep problems, low grade fevers and loose bowel movements. Dr. Khurana's examination revealed eleven out of eighteen tender points and ulcers. (*Id.* at 54, 61) Plaintiff's muscle strength was noted as 5/5 in all extremities. Dr. Khurana's diagnoses were SLE by history, undifferentiated connective tissue disorder, fibromyalgia, osteopenia, long term steroid use, vitamin D deficiency, and drug toxicity monitoring. (*Id.* at 53, 55 -56) Dr. Khurana ordered tests to confirm SLE, and lowered plaintiff's steroid dosage.

On May 12, 2010, plaintiff returned to Dr. Cabry with complaints of back pain radiating into the buttocks. (D.I. 6-8 at 4) She described the pain as constant and

9

worse with bending, stooping and standing for too long. She also reported pain in her hands related to lupus. Dr. Cabry's examination revealed that she had a full range of motion without pain, tenderness, crepitus or instability "except she does have tenderness at the lumbar spin, L3 to S1 bilaterally." (*Id.*) She had full range of motion of the knees and ankles. Dr. Cabry concluded that her lower back pain could be a flare of the lupus or arthritis rather than disc herniation. He ordered an MRI of the lumbar spine, recommended vitamin D and calcium, and continuation of current medical regimen.

On May 13, 2010, plaintiff had a gastroenterology evaluation by Dr. Sanford Herold. (D.I. 6-7 at 41-43) Dr. Herold noted plaintiff's lupus diagnosis, fatigue, joint pain, slurred speech, and treatment with Plaquenil. Continued problems with facial rashes and mouth ulcers was documented. Examination notes describe plaintiff as overweight, weighing 157 pounds. Dr. Herold ordered a colonoscopy to rule out inflammatory bowel disease. (*Id.* at 42)

On May 18, 2010, ophthalmologist Dr. John C. Witherell examined for evidence of Plaquenil toxicity. (D.I. 6-7 at 43 - 44) Dr. Witherell found no toxicity and ordered a reevaluation in six months and said to continue Plaquenil.

Plaintiff returned to Dr. Cabry on May 26, 2010, complaining about lupus. (D.I. 6-8 at 3) His physical examination showed fifteen out of eighteen tender points, diffuse tenderness at the lumbar spine L3-S1 bilaterally with very limited range of motion. Dr. Cabry observed:

> Forward flexion to 45 to 55 degrees, extension 5 degrees, side-bending
> rotation is full. Full range of motion in the knees and ankles, full strength,
> full range of motion of the shoulders, elbows, and wrist. She does have

> pain with range of motion of the wrist. She has tenderness diffusely through
> the hands at the MCP and IP joints without significant swelling. She has
> some loss of grip strength.

(D.I. 6-8 at 3) He lists lupus and fibromyalgia as diagnoses with chronic back pain

related to her disease. Dr. Cabry recommended aqua therapy, following current

medical regimen, and six-week revisit. (D.I. 6-8 at 3)

Plaintiff had pulmonary function testing in June, August and September, 2010 at

Asthma and Allergy Associates. (D.I. 6-10 at 6, 7, 8, 10) Exam notes show an

impression of asthma. (*Id.* at 18) Notes from June 28, 2010 detail plaintiff's complaint

of fatigue, assessment of lupus, and sleep apnea. (D.I. 6-10 at 3) Plaintiff's weight is

listed as 156 pounds at a height of 60 inches. Exam notes from August 10, 2010 reveal

complaints of shortness of breath, coughing with mucus coming through her nose,

reflux with an impression of asthma, restrictive/weight/lupus, sleep apnea, and GERD.

Plaintiff was advised to lose weight, and prescribed Symbicort[15] and Albuteral.[16] (*Id.* at

19 -21)

In June and July, plaintiff participated in aqua therapy. Session notes indicate

that plaintiff was improving and responding well to massage. (D.I. 6-8 at 41)

---

[15]Symbicort is used to prevent bronchospasm in people with asthma. *See* http://www.drugs.com/symbicort.html (Last visited on June 5, 2016).

[16]Albuterol is a "bronchodilator that relaxes muscles in the airways and increases air flow to the lungs." *See* http://www.drugs.com/albuterol.html (Last visited on June 5, 2016).

On July 2, 2010, plaintiff had a colonoscopy performed.  (D.I. 6-13 at 58) Plaintiff was diagnosed with gastroesophageal reflux disease ("GERD"), and colon angiodysplasia.  Nexium[17] was prescribed.

On July 9, 2010, plaintiff had a pulmonary function study done.  (D.I. 6-7 at 47) Dr. Pierre Frederique concluded that the "combination of restrictive lung pattern with a reduction in diffusing capacity suggests interstitial lung disease.  Further evaluation may consist of a high resolution CT scan of the chest." (Id.)

On July 14, 2010, plaintiff appeared for an appointment with Dr. Cabry.  (D.I. 6-8 at 2)  His physical examination revealed that plaintiff had diffuse tenderness to the hand, diffuse tenderness to lumbar spine, but otherwise neurovascularly intact.  Notes indicate diffuse joint pain was caused by lupus and fibromyalgia.  Dr. Cabry observed that, in addition to lupus and fibromyalgia, plaintiff was suffering with chronic back pain and ongoing colitis, likely autoimmune as well.  A six-week follow-up appointment was scheduled.

On July 26, 2010, CRNP Eckart indicates that plaintiff had the following symptoms:  (1) parethesias in her hands; (2) lack of grip strength; (3) muscle cramps; (4) weakness and aches; (5) loss of strength; (6) numbness and tingling; (7) problems with concentration; (8) stuttering ; and (9) fecal incontinence.  (D.I. 6-9 at 408-409) Eckart's assessment was lupus, paresthesia, and herniated cervical disc.  She recommended follow-up with specialists for each of these problems.

---

[17]Nexium is a "proton pump inhibitor that decreases the amount of acid produced in the stomach."  http://www.drugs.com/nexium.html (Last visited on June 3, 2016).

On August 27, 2010, pulmonologist Dr. Gerald A. Meis examined plaintiff. (D.I. 6-14 at 29) Plaintiff complained of shortness of breath, asthma, esophageal reflux, and lupus. Dr. Meis' physical examination revealed no abnormal findings. Dr. Meis concluded that plaintiff had problems, including abnormal pulmonary function testing related to lupus, asthma, shortness of breath, GERD and lupus. (Id. at 32)

On September 20, 2010, plaintiff went to Dr. Sweeney, complaining of neck, ankle and leg pain, difficulty speaking, swelling of hands and extreme fatigue, headaches, difficulty walking and inability to sleep. (D.I. 6-12 at 33, 35) At the time, plaintiff was taking steroids as well as other medications, including Nexium, Lexapro, Plaquenil, Allegra,[18] Valtrex,[19] Celebrex,[20] Bentyl and Percocet.[21] (Id. at 33-34) Plaintiff's examination revealed: (1) speech fluent and cognition intact; (2) finger dexterity and tandem gait normal; and (3) sensory and reflect exam normal. (Id. at 35-36) Dr. Sweeney found no change in plaintiff's examination since 2008, however, Dr. Sweeney observed that her complaints continued. Because plaintiff did not have a neurocognition evaluation done with Dr. Borson as recommended, Dr. Sweeney could

---

[18]Allegra is an "antihistamine that reduces the effects of natural chemical histamine in the body." See http://www.drugs.com/allegra.html (Last visited on June 6, 2016).

[19]Valtrex "is an antiviral drug [that] [s]lows the growth and spread of the herpes virus to help the body fight the infection." See http://www.drugs.com/valtrex.html (Last visited on June 6, 2016).

[20]Celebrex is "used to treat pain or inflamation caused by many conditions." See http://www.drugs.com/celebrex.html (Last visited on June 6, 2016).

[21]Percocet is "used to relieve moderate to severe pain." See http://www.drugs. com/percocet.html (Last visited on June 6, 2016).

not compare present symptoms.  Notes reflect that an MRI[22] from 2008 shows

degenerative disc disease with flattening of the cord at C5-C6.  (D.I. 6-7 at 10)

Plaintiff returned to Dr. Meis on September 24, 2010 for chest tightness, lupus,

shortness of breath, esophageal reflux.  (D.I. 6-14 at 26)  A September 2, 2010 chest

CT showed "several small nodules in the lungs."  (D.I. 6-14 at 27, 28)  Plaintiff's weight

is listed as 157 pounds.  Exam notes indicate that plaintiff has chest pressure/tightness,

obstructive sleep apnea, esophageal reflux, lupus, abnormal pulmonary function,

obesity and was advised to lose weight.  (D.I. 6-14 at 27-30)

On September 30, 2010, the results of plaintiff's sleep study revealed frequent

leg movements, and upper airway resistance problems.  (D.I. 6-13 at 2, 3)  Plaintiff was

prescribed Nuvigil[23] to help with daytime fatigue and to improve daytime function.  Exam

notes reflect that plaintiff had followed instructions to lose weight, to wit, losing seven

pounds.

On October 14, 2010, plaintiff was treated by gastroenterologist  Dr. John

Draganescu for gastroesophageal reflux.  (D.I. 6-13 at 36)  Plaintiff reported

improvement, with no diarrhea or significant heartburn or regurgitation since starting

Nexium twice daily.  Dr. Draganescu planned to continue treatment with Nexium and

noted that "previous diarrhea has resolved, and was likely related to mobility, in

absence of any evidence of inflammatory or infectious processes."  (*Id.* at 40)

---

[22]A November 20, 2010 shows no significant change with cervical spondylosis
with cord compression.  (D.I. 6-13 at 15)

[23]Nuvigil is "a medication that promotes wakefulness."  See http://www.drugs.
com/nuvigil.html  (Last visited on May 24, 2016).

14

On November 3, 2010, psychologist Dr. Andrew Borson completed a

neuropsychological evaluation of plaintiff. (D.I. 6-13 at 6) Plaintiff reported having

difficulty with paperwork errors, forgetting tasks, trouble with organization, multi-

tasking, difficulty in finding words, and expressive language. She said all the problems

developed after she was diagnosed with lupus. Dr. Borson performed a battery of

tests, including cognitive, reasoning, language function, memory, and emotional

functioning. In summarizing the results, Dr. Borson wrote "the testing suggests that

plaintiff may focus on her somatic difficulties as a result of her depressive mood, which

can create a negative cycle of increasing worry about her daily difficulties feeding her

depressive mood, which then leads to increased focus on her daily difficulties." (Id. at

9) He further concluded that:

> Plaintiff shows mildly impaired neuropsychological functioning. She showed
> poor performance on measures of complex executive functioning, including
> difficulties with visually-oriented reasoning and problem-solving, inductive
> reasoning, and cognitive flexibility. She also showed relatively poor visual
> perception, although this may be a premorbid tendency. She had difficulties
> with retrieval of long-term information, and showed some problems with
> word-finding and with the expression of abstract concepts, although there was
> a sense that her underlying verbal conceptual abilities were intact. She
> showed fairly good immediate memory and mental control, as well as
> processing speed, and showed relatively intact retrieval and retention on most
> memory tasks, although with some variability. The overall pattern does not
> point to a specific type of problem, and there were a number of indications, both
> in the variability of performance, and instances in which anxiety and attention
> seemed to cause problems, suggesting that some, if not most, of the problems
> she experienced may have a functional basis.

(Id. at 9) Further, "it seems premature to conclude that her current difficulties are

permanent; rather, they may reflect the extent of her emotional difficulties, and so may

be capable of improvement with improvement in her mood." (Id.) Dr. Borson

recommended psychiatric treatment.

15

On November 15, 2010, Dr. Keisha Wilford examined plaintiff. (D.I. 6-13 at 15) Plaintiff reported feeling horribly. Her physical examination was within normal limits. (*Id.* at 18) Dr. Wilford found "no clinical neurologic findings" with respect to cervical myelopathy with the MRI of the cervical spine stable since 2008. Dr. Wilford switched plaintiff's medicine from Neurontin to Cymbalta[24] for fibromyalgia pain because Neurontin caused drowsiness. Dr. Wilford recommended that plaintiff see a psychiatrist for depression and return for a follow-up visit in six weeks. (*Id.* at 19)

From January through March, 2011, plaintiff was treated at Wilmington Psychiatric Service for panic attacks, sleep problems, depression, weight gain, forgetfulness, and tearfulness. (D.I. 6-14 at 2 -14) Progress notes reveal that plaintiff was depressed and had panic disorder.

On January 3, 2011, plaintiff returned for a follow-up appointment with Dr. Wilford, complaining of cervical myelopathy, pain, and numb hands. (D.I. 6-14 at 48) Dr. Wilford increased the dosage of Cymbalta. (*Id.*) No other changes were made and a three-month follow-up appointment was scheduled.

On January 14, 2011, plaintiff saw Dr. Passero for tenderness in the upper back and pain on range of motion.   (D.I. 6-14 at 6) Dr. Passero diagnosed SLE, Sjogren's, SSA positive ANA, degenerative joint disease in the hand, vitamin D deficiency, possible fibromyalgia, sleep disturbance, and weight gain.

On April 18, 2011, plaintiff presented at an office visit with Dr. Meis for follow-up asthma treatment. (D.I. 6-14 at 15) Plaintiff complained about waking up at night with

---

[24]Cymbalta is used to treat major depressive disorder in adults. See http://www.drugs.com/cymbalta.html (Last visited on May 24, 2016).

16

a cough and being unable to return to sleep after using a nebulizer. Notes reflect that plaintiff was taking several prescription medicines, including Plaquenil, Nexium, Lexapro, Celebrex, and Cymbalta. No abnormal findings were noted.

Plaintiff returned to Dr. Passero on May 5, 2011 for hand pain, joint tenderness in hands and leg weakness. (D.I. 6-14 at 33) Plaintiff's weight was listed as 162 pounds.

On May 19, 2011, plaintiff reported to an appointment with Dr. Wilford for follow-up of her complaints of cervical myelopathy, neck/back pain, and headaches. (D.I. 6-14 at 44) Plaintiff reported an increase in pain and feelings of pins and needles in her legs, numbness, and fatigue. A sleep study report showed plaintiff did not need CPAP. (D.I. 6-14 at 44) Dr. Wilford did not notice any change in her neurological examination. (*Id.* at 46) Dr. Wilford's impressions were herniated cervical disc with cervical myelopathy, neck/back pain and headaches in the setting of lupus, parethesias, restless leg syndrom, and depression. Dr. Wilford changed plaintiff's medications by reducing Plaquenil, removing Symbicort and adding Klonopin.[25] (*Id.* at 45)

On March 15, 2012, plaintiff was treated by gastroenterologist Dr. Monica Zeitz for acid reflux, vomits through her nose, problems swallowing, constipation at times, choking at night, and episodes of diarrhea with fever and stool incontinence. (D.I. 6-15 at 61) Progress notes depict plaintiff's weight at 167 with a BMI of 33.8. (*Id.* at 63) Dr. Zeitz's assessment was GERD, likely worsened by Sjogren's with a question of

---

[25]Klonopin is used to treat panic and seizure disorders. *See* http://www.drugs. com/klonopin.html (Last visited on June 6, 2016).

dysmotility from lupus, diarrhea and full incontinence of feces with a question of motility. (*Id.* at 66-67)

On July 9, 2012, plaintiff reported to Dr. Kasarda of Westside Family Practice to establish herself as a patient and talk about lupus. (D.I. 6-14 at 70) Exam notes reflect that plaintiff had been experiencing diarrhea for over six months and occasional incontinence.

August 16, 2012, Dr. Kasarda treated plaintiff for complaints of anxiety and depression. (D.I. 6-15 at 53, 55) In December 2012, plaintiff returned to Dr. Kasarda for respiratory problems, including wheezing, cough, choking at night on mucus, and problems with food particles coming through her nose. (*Id.* at 68) Exam notes describe plaintiff as obese and experiencing pain on movement of leg. (D.I. 6-15 at 69) Dr. Kasarda advised plaintiff to lose weight and consult with a rheumatologist, gastroenterologist, and pain management specialist.

## C. MetLife Disability Forms

CRNP Eckart completed medical claim forms for MetLife disability in 2010. (D.I. 6-11 at 1-17; 6-12 at 1-13; 6-13 at 26-35) Plaintiff's primary diagnosis is SLE, with other disorders including undifferentiated connective tissue disorder, herniated cervical discs, asthma, restrictive lung disease, fibromyalgia, and sleep apnea. CRNP Eckart notes plaintiff's symptoms as hand and joint pain, extreme fatigue, bowel problems and swelling of the hands and feet. (D.I. 6-11 at 1-3, 7, 12) CRNP Eckart concluded that plaintiff was: (1) able to work zero hours a day; (2) intermittently walk for two hours; and (3) unable to perform fine finger movement, eye/hand movement, or push/pull. (D.I. 6-13 at 28, 31, 33-34; D.I. 6-11 at 3, 7)

18

On June 2, 2010, Dr. Savinese filled out an "attending physician supplementary statement" for MetLife disability. (D.I. 6-11 at 12) In pertinent part, Dr. Savinese rated plaintiff's ability to sit, stand or walk as "intermittently" without selecting a number of hours (0-8) that might apply.  He wrote that plaintiff had no ability to climb, twist/bend/stood or to reach above shoulder level.  He said she was able to operate a motor vehicle.  In response to the question "[h]ave you advised patient to return to work" in the prognosis section, Dr. Savinese wrote "I did not advise [plaintiff] to return to work" and concluded that plaintiff is able to work "0 hours per day." (*Id.*) In response to questions regarding plaintiff's limitations and restriction from work and daily activities, Dr. Savinese opined "[p]laintiff has a lupus flare-up, generalized pain and cognitive impairment." (*Id.*) He listed her height as 60 inches and weight as 153 pounds.

### D. State Agency Consultants

In October 2010, state agency expert psychological consultant Pedro Ferreira, Ph.D. reviewed plaintiff's records and concluded that her depression was not severe. (D.I. 6-3 at 9) In May 2011, state agency expert psychological consultant Aroon Suansilppongse, M.D. characterized plaintiff's mental impairments as mild. (*Id.* at 25) He found that plaintiff would be moderately limited in handling complex tasks at work, but not significantly limited in handling simple work tasks. (*Id.* at 28-29) Dr. Suansilppongse concluded that plaintiff would be moderately limited in dealing with the general public, accepting instructions and responding to criticism from supervisors. He found that she would be moderately limited in responding to workplace changes and independent planning.

19

### E. Administrative Hearing

#### 1. Plaintiff's testimony

Plaintiff testified that she was born on July 8, 1973 and was 39 years of age at the time of the hearing.  (D.I. 6-2 at 48)  She is a high school graduate with some college and technical school training.  (Id.)  She weighs 169 pounds.  Plaintiff is separated from her husband and resides with her 17-year old daughter.  (Id. at 64) Plaintiff's daughter helps her get dressed daily.

During her 15 years of employment, plaintiff worked as a medical secretary for practices.  (Id. at 51)  From 1999 - 2003, she worked as a medical secretary with duties that included scheduling appointments, pre-certifications, insurance and billing.  (Id. at 52-53)  In 2003 through 2004, plaintiff worked as a surgery coordinator for a gastroenterology practice.  (Id. at 53)  From 2005-2009, she worked as a medical secretary for an orthopaedic practice.  (Id. at 54-55)

Plaintiff hired a maid service in 2012 because it became too difficult to perform house cleaning responsibilities.  (Id. at 65)  She is able to put laundry in the washer but her daughter assists with drying and folding clothes.  Plaintiff is able to drive to the grocery store to purchase a few items, doctor appointments, and to pick up certain prescriptions at the pharmacy.  (Id. at 65)  Plaintiff is unable to keep track of bills payments so her daughter is responsible for the finances.  (Id. at 66)  Plaintiff is able to cook and prepare light meals, but unable to chop and slice.  She orders take-out food often.  Her memory recall is poor, as she has forgotten her wallet at stores.

Plaintiff has problems sleeping, averaging four hours nightly. During sleep, plaintiff has difficulties with breathing, vomiting through her nose, and going to the bathroom on herself. (*Id.* at 67) She takes frequent naps throughout the day, lasting about 30-45 minutes. (*Id.* at 68) She tries to do physical therapy exercises to prevent her joints from locking up. Plaintiff also tries to take a daily walk. If plaintiff finds these activities too tiring, she simply isolates herself at home.

Plaintiff has problems concentrating, having to repeatedly read the same material. (*Id.* at 67) She gained about thirty-five pounds since diagnosed with SLE and attributes the weight gain to steroid medication prescribed to treat lupus. (*Id.* at 73) Plaintiff finds it difficult to get along with people and maintains a lot of anger for the limitations imposed by her physical condition. When she worked, she became upset with coworkers who were too loud and distracting. (*Id.* at 67)

Plaintiff testified that she is in constant pain that is not relieved by medication. (*Id.* at 64) The medication causes side effects, including problems with bowel movements, dry mouth, ulcers, blurred vision, forgetfulness, and tiredness. (*Id.* at 63) Plaintiff has pain in the neck, arms, and legs. (*Id.* at 62-63) Her face swells and both arms go numb. (*Id.* at 62) Her legs are very weak and burn with needle feelings.

Plaintiff moved from a two-story home to a smaller, ranch home because she was unable to walk up the steps. (*Id.* at 60) She uses a cane whenever standing. She is very weak and cannot stand for more than five or ten minutes. (*Id.* at 61) Plaintiff is able to sit for about 15 minutes at a time. (*Id.*) She avoids lifting, but can carry a half gallon of milk. Plaintiff is unable to get dressed, comb her hair, put on socks or pants.

21

She admitted being able to pick up coins on a table, one by one. (*Id.* at 62) Both

hands cause problems, which commenced after being diagnosed with lupus. She also

had braces for her hands, which provide little relief. She reports weakness and shaking

in her hands, causing illegible handwriting. (*Id.* at 71)

Plaintiff was prescribed a TENS unit to help with nerve pain. (*Id.* at 69) The

TENS unit did not help plaintiff but actually hurt her. Physical therapy and massages

started to hurt her joints. (*Id.* at 70) She started receiving long term disability payments

from MetLife in 2010. (*Id.* at 76)

## 2. Vocation Expert's ("VE's") testimony

Following plaintiff's testimony, the ALJ consulted the VE. (D.I. 6-2 at 80) In

determining whether jobs existed in significant numbers in the regional and national

economies that plaintiff could perform given her RFC, the ALJ posed hypothetical

questions to the VE. (*Id.* at 81-82)

> ALJ: For the first hypothetical, I want you to assume the individual can
> lift and carry ten pounds. The individual can sit for six hours in an eight-
> hour workday, stand and walk a combination total of three hours in an
> eight-hour workday. The individual needs to have the ability to change
> position from sitting to standing at will. The individual can occasionally
> climb stairs, stoop, kneel, crouch, crawl. The individual should not be
> exposed to extreme heat, humidity, pulmonary irritants like gas, dust,
> fumes, odors or vibration. The individual can occasionally push and
> pull with upper extremities. The individual is limited to simple, routine,
> repetitive tasks, involving short, simple instructions in an environment
> with few workplace changes, no strict time or production quotas, no
> public contact and only brief, infrequent contact with supervisors and
> co-workers, not requiring teamwork or collaboration. I assume such
> individual could not do [plaintiff's] past work, correct?
> VE: Correct, Your Honor.
> ALJ: Any other jobs such an individual could perform?
> VE: Yes, Your Honor, at the sedentary exertional level a position as a
> type copy examiner . . . a position as a patched . . .a surveillance

22

system monitor. . . .

(*Id.* at 81-82)  The VE further testified that the jobs referenced would not be available if

the person were:  absent more than one day a month; unable to focus for two hours at

a time; taking more than the usual two, fifteen minute breaks a day; or unable to stand,

sit and walk a combination total of eight hours in an eight-hour workday. (*Id.* at 82)

### F. The ALJ's Findings

The ALJ made the following findings:

> 1. [Plaintiff] meets the insured status requirements of the Social
> Security Act through December 31, 2015.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since
> April 29, 2010, the amended alleged onset date (20 C.F.R. 404.1571
> et seq.)
>
> 3. [Plaintiff] has the following severe impairments: systemic lupus
> erythematosus ("SLE"), fibromyalgia, upper airway resistance
> syndrome, cervical spondylosis, cognitive disorder, and diarrhea
> (20 C.F.R. 404.1520(c)).
>
> 4. [Plaintiff] does not have an impairment or combination of
> impairments that meets or medically equals the severity of one
> the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix
> 1 (20 C.F.R. 404.152(d), 404.1525 and 404.1526).
>
> 5.  After careful consideration of the entire record, the undersigned
> finds that [plaintiff] has the RFC: she can lift/carry 10 pounds; she can
> sit for six hours and stand/walk for three hours in an eight-hour workday,
> but she needs the ability to change position from sitting to standing at will;
> she can occasionally climb stairs, stoop, kneel, crouch, crawl, and
> push/pull with the upper extremities; she cannot climb ladders or be
> exposed to extreme heat, humidity, gas, dust, fumes, odors, vibrations,
> moving machinery, or unprotected heights; she is limited to simple,
> routine, repetitive tasks involving short, simple instructions in an
> environment with few workplace changes, no strict time or production
> quotas, no public contact, and only brief, infrequent contact with
> supervisors and coworkers not requiring teamwork or collaboration.

6. [Plaintiff] is unable to perform any past relevant work (20 C.F.R. 404.1565).

7. [Plaintiff] was born on July 8,1973 and was 36 years old, which is defined as a younger individual age 18-49, on the amended alleged onset date (20 C.F.R. 404.1563).

8. [Plaintiff] has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [plaintiff] is "not disabled," whether or not [plaintiff] has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering [plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform (20 C.F.R. 404.1569 and 404.1569(a)).

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from April 29, 2010, the amended onset date, through the date of this decision (20 C.F.R. 404.1520(g)).

(D.I. 6-2 at 24-35)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. Accordingly, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. See Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. See id. In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. See id. at 1190–91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir.1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)). Where, for

example, the countervailing evidence consists primarily of the plaintiff's subjective
complaints of disabling pain, the ALJ "must consider the subjective pain and specify his
reasons for rejecting these claims and support his conclusion with medical evidence in
the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir.1990).

"Despite the deference due to administrative decisions in disability benefit cases,
'appellate courts retain a responsibility to scrutinize the entire record and to reverse or
remand if the [Commissioner's] decision is not supported by substantial evidence.'"
*Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d
968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the
[Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the
[Commissioner's] decision with or without a remand to the [Commissioner] for
rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Regulatory Framework

Social Security Administration regulations incorporate a sequential evaluation
process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520.
The ALJ first considers whether the claimant is currently engaged in substantial gainful
activity.  If he is not, then the ALJ considers in the second step whether the claimant
has a "severe impairment" that significantly limits his physical or mental ability to
perform basic work activities.  If the claimant suffers a severe impairment, the third
inquiry is whether, based on the medical evidence, the impairment meets the criteria of
an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1

26

(1999), which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his or her past work.  If the claimant cannot perform his or her past work, then step five is to determine whether there is other work in the national economy that the claimant can perform.  *Sykes v. Apfel*, 228 F.3d 259, 262–63 (3d Cir.2000) (citing 20 C.F.R. § 404.1520).  If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step.  20 C.F.R. § 404.1520(a).  It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled.  The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments.  However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement.  20 C.F.R. §§ 404.1527(e)(2) & 404.1527(e)(3).  The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

### B. Arguments on Appeal

On appeal, plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ failed to:   (1) afford appropriate weight to the opinions of Dr. Savinese and CRNP Eckart; (2) failed to discuss evidence of mental

27

health impairment and obesity; (3) apply the correct standard to assess fibromyalgia; and (4) take into account work history in assessing plaintiff's credibility. (D.I. 9, 14) Defendant counters that substantial evidence supports the ALJ's analysis of opinion evidence, RFC assessment, plaintiff's fibromyalgia, and credibility assessment. (D.I. 13)

### 1. Weight of medical evidence

A treating physician's opinion is afforded "controlling weight," if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. § 404.1527(c)(2). The more a treating source presents medical signs and laboratory findings to support his/her medical opinion, the more weight it is given. *Id.* Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id.* An ALJ may only outrightly reject a treating physician's assessment based on contradictory medical evidence or a lack of clinical data supporting it, not due to his or her own credibility judgments, speculation or lay opinion. *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000); *Lyons–Timmons v. Barnhart*, 147 Fed. Appx. 313, 316 (3d Cir.2005).

Even when the treating source opinion is not afforded controlling weight, it does not follow that it deserves zero weight. Instead, the ALJ must apply several factors in determining how much weight to assign it. *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 662 (D. Del. 2008). These factors include the nature and extent of the treatment relationship, the length of the treatment relationship, the frequency of examination,

28

supportability of the opinion afforded by the medical evidence, consistency of the

opinion with the record as a whole, and the specialization of the treating source. *Id.* If

an ALJ does not conduct this analysis, a reviewing court cannot determine whether the

ALJ actually considered all the relevant evidence, and the ALJ's decision cannot stand.

*Id.* To that end, if a reviewing court is denied this opportunity, the claim must be

remanded or reversed and all evidence must be addressed. *Burnett v. Commissioner*

*of Social Security*, 220 F.3d 112, 119-120 (3d Cir. 2000).

Although the ALJ recognized that Dr. Savinese was plaintiff's treating physician,

he did not give Dr. Savinese's opinion controlling or significant weight, finding it "was

conclusory or not well supported by the medical signs and laboratory findings," and

inconsistent with treatment records "documenting essentially normal physical and

neurological examinations despite plaintiff's subjective allegations." (D.I. 6-2 at 32)

Significantly, the ALJ opined that "Dr. Savinese indicated in these work certificate forms

that he only expected the claimant's inability to work to be temporary." (*Id.*)

The record evidence, however, reflects that the ALJ did not consider Dr.

Savinese's attending physician supplementary statement.[26] This statement states that

plaintiff is unable to work and sets forth her limitations. Specifically, in the clinical

findings and data section, Dr. Savinese avers that plaintiff can sit, stand and walk

intermittently. (D.I. 6-11 at 12) She is unable to climb, twist, bend or stoop and cannot

reach above shoulder level. (*Id.*) Dr. Savinese indicates that plaintiff is able to

occasionally lift only up to ten pounds and can drive a car. Dr. Savinese opines that

---

[26]It appears that the ALJ attributed this form to CRNP Eckart. (D.I. 13 at 17, fn 2)

29

plaintiff is unable to work any hours a day and that he did not advise her to return to work.[27]  He concludes that she has lupus flare ups, generalized pain, and cognitive impairment.  Dr. Savinese's opinion is consistent with CRNP Eckart's assessment that plaintiff is unable to work.  This assessment is not inconsistent with much of the other objective medical evidence or with plaintiff's testimony.

In light of the ALJ's failure to discuss relevant evidence, remand is appropriate and may affect the outcome of the case.  The court need not resolve any of the additional challenges raised at this time since the ALJ will necessarily re-examine all the evidence on remand.

## IV. CONCLUSION

For the reasons discussed above, the court remands the case for further proceedings consistent with this memorandum opinion.  Plaintiff's motion for summary judgment is granted and defendant's motion for summary judgment is denied.  An appropriate order shall issue.

---

[27]Under such restrictions, none of the jobs referenced by the VE would be available.  (D.I. 6-2 at 81-82)

30